427 A.2d 153

**In re DETERMINATION OF PRIORITY OF COMMISSION AMONG CERTAIN JUDGES OF the SUPERIOR COURT AND COMMONWEALTH COURT.**

Supreme Court of Pennsylvania.

Argued Oct. 15, 1980.

Decided March 24, 1981.

Victor R. Delle Donne, Baskin & Sears, Pittsburgh, for Craig, J.

David F. Binder, Narberth, for Cavanaugh, J.

Walter T. McGough, Anthony J. Basinski, Pittsburgh, for Brodsky, J.

Sheldon L. Albert, Philadelphia, for Williams, J.

## OPINION OF THE COURT

O'BRIEN, Chief Justice.

This action for declaratory judgment was commenced in Commonwealth Court as a Petition for Review. We assumed extraordinary jurisdiction of the matter pursuant to 42 Pa.C.S.A. § 726.

Petitioners, Superior Court Judge James R. Cavanaugh and Commonwealth Court Judge David Craig, seek a judgment declaring that, for the purpose of determining seniority on their respective courts, priority of commission shall be measured from the beginning of service on the court, whether the initial service is by appointment or by election.

Judge Craig and Judge John A. MacPhail were appointed to the Commonwealth Court on June 21, 1978. As a result of the casting of lots between the two appointees, Judge Craig was accorded seniority. Judge Cavanaugh was appointed to the Superior Court on June 28, 1979. Thereafter, all three appointed judges were elected to full terms dating

from the first Monday of January 1980. Judge John G. Brosky and Judge Richard B. Wickersham were elected to the Superior Court and Judge Robert W. Williams, Jr. was elected to the Commonwealth Court for terms beginning the first Monday of January, 1980. Petitioners seek to establish priority of commission on the Superior Court for Judge Cavanaugh over Judges Brosky and Wickersham and on the Commonwealth Court for Judges Craig and MacPhail over Judge Williams. All five judges were first elected to a term of office on their respective courts at the same time.

The question presented by this case is the proper interpretation of Article 5, § 10(e) of the Pennsylvania Constitution of 1968, which pertains to the casting of lots for priority of commission by two or more justices or judges who assume office at the same time. Petitioners herein assert that § 10(e) authorizes the measurement of judicial seniority from the time a judge or justice assumes office whether by election or appointment.

The primary legal implication which follows from establishing priority of commission or order of seniority among judges is in determining who shall serve as Chief Justice of Pennsylvania and as president judges of those courts composed of seven or less members. Pursuant to Article 5, § 10(d) of the Constitution, the positions of Chief Justice and President Judge are accorded to the justice or judge with the longest continuous service on each of the respective courts.

The Pennsylvania Constitution of 1874, art. V, § 17, provided for the casting of lots to determine seniority as follows:

"Should any two or more judges of the Supreme Court, or any two or more judges of the court of common pleas for the same district, *be elected at the same time*, they shall, as soon after the election as convenient, cast lots for priority of commission, and certify the result to the Governor, who shall issue their commissions in accordance therewith." (Emphasis supplied.)

The Constitution of 1968, article V, § 10(e), contains a similar provision for determining priority of commission.

"(e) Should any two or more justices or judges of the same court *assume office at the same time*, they shall cast lots forthwith for priority of commission, and certify the results to the Governor who shall issue their commissions accordingly." (Emphasis supplied.)

Petitioners assert that the change in the language of the two constitutions from "be elected at the same time" to "assume office at the same time" is significant and indicates an intention by the framers of the Constitution of 1968 and the voters who adopted it that judicial seniority be determined on the basis of length of experience on the court. Thus, they contend, seniority must date from the time judges take office, whether by gubernatorial appointment or election, rather than only from the time they are elected, as stated in § 17 of the Constitution of 1874. Therefore, petitioners conclude that a judge who initially assumed office by appointment is not required by § 10(e) of the Constitution of 1968 to cast lots for seniority following his election to office.

Neither the Constitution of 1874 nor the Constitution of 1968 directly addresses the question petitioners raise—*viz.*, whether appointive judicial service should be considered in determining which member of a court has priority of commission. Nevertheless, this Court has interpreted the Constitution of 1874, article V, § 17, to clearly mean that when two judges are elected to the same court at the same time, the casting of lots is the sole method of determining the order of seniority between them and no prior appointive service in the same court may be considered in determining the priority of their commissions. *President Judges Determination Cases*, 420 Pa. 243, 216 A.2d 326 (1966).

This Court gave the same interpretation to the Constitution of 1968, article V, § 10(e), when it adopted Rule 705 of the Pennsylvania Rules of Judicial Administration. Rule 705 provides, *inter alia*, that seniority among judges elected at the same time or appointed at the same time is to be

determined by a separate casting of lots; that elected judges shall have seniority over appointed judges; and that appointive service shall not be considered in computing seniority among elected judges.[1]

Petitioners acknowledge that this Court's interpretation of Article V, § 17 of the Constitution of 1874, excluding consideration of appointive service from the computation of judicial seniority, was the correct one. They agree with the conclusion in *President Judges Determination Cases, supra,* that the phrase, "be elected at the same time", was "absolutely clear and unambiguous" in its intention to compute seniority from the date of election. Thus, petitioners argue that the same clear and unambiguous language would have been retained in the Constitution of 1968 if the intention had been to continue to disregard appointive service. They maintain since the new Constitution employed different words in Article 5, § 10(e), a change in the meaning of this provision was intended, and appointive service was meant to be considered in determining seniority under the Constitution of 1968.

Moreover, petitioners note a significant change from the former constitution in a related provision pertaining to the determination of Chief Justice and president judges, Article

1. Pa.R.J.A. No. 705, in pertinent part, reads as follows:
   "Rule 705. *Seniority of Judges*
      "(a) *Seniority between elected and appointed judges.* Elected judges shall have seniority over appointed judges.
      "(b) *Seniority among elected judges.* The seniority of elected judges shall be determined on the basis of the date of election, if service is continuous on the same court. Service by appointment shall not be considered in computing seniority among elected judges.
      "(c) *Seniority among appointed judges.* The seniority of appointed judges, for the duration of appointment, shall be computed from the date of appointment, if service is continuous on the same court.
      "(d) *Simultaneous election or appointment.* Should any two judges of the same court be elected or appointed at the same time, they shall cast lots forthwith for priority of commission and seniority before the Chief Justice or the president judge of the court in which they are to serve, and certify the results to the Governor."

5, § 10(d). The comparable provision in the Constitution of 1874 contained language which had been interpreted as applicable only to elected service.[2] Yet the new language of § 10(d) accorded the positions of Chief Justice and president judge to the justice or judge "longest in continuous service." Petitioners argue that the phrase "longest in continuous service" embraces appointive as well as elective service in this application of the seniority principle.

■ While petitioners' textual argument is well-made, it is, nevertheless, unpersuasive in the context of the legislative history of the Constitution of 1968 and the clear public policy of this Commonwealth which favors an elected over an appointed judiciary. *Berardocco v. Colden*, 469 Pa. 452, 366 A.2d 574 (1976).

■ The official Journal of the Constitutional Convention of 1967–68 indicates that the amendment which eventually became § 10(e) was presented by Delegates Scranton and Amsterdam. Delegate Woodside spoke to the amendment explaining that it was "a provision which is in the substantial form that was in the present constitution and was overlooked. It should be provided for in this Constitution." Delegate Amsterdam explained further:

"In accordance with an amendment put in by Judge Woodside, we provided in courts of 7 or less that the judges shall be the President Judges or Chief Justice as the case may be for longest and continuous service. Because of this situation, we have to provide as the old Constitution did, in the event there are two or more justices or judges who assume offices at the same time,

2. The Constitution of 1874, art. V, § 2, relating to the Supreme Court, provided in pertinent part: ". . . The judge whose commission shall first expire shall be chief justice, and thereafter each judge whose commission shall first expire shall in turn be chief justice." *In Selection of Presiding Judges*, 15 Pa.D & C.2d 8 (1958) the attorney general interpreted that section to mean that the Chief Justice of the Supreme Court shall be that judge who has served on the court the longest period of time under an elected term.

they shall cast lots for priority of commission and that is all this does." [3]

Those remarks do not suggest an intention by the delegates offering the amendment to change the established method of computing seniority inasmuch as the amendment under consideration by the Convention was described as substantially the same as the provision for casting lots in the Constitution of 1874. That provision, it will be recalled, had been interpreted to exclude appointive service in determining seniority. *President Judges Determination Cases, supra.*

Furthermore, there is an obvious and practical explanation for the decision by the drafters of § 10(e) to substitute the phrase "assume office at the same time" for the phrase "be elected at the same time." Article V, § 13(d) of the proposed constitution offered the voters the option of an appointed judiciary.[4] Thus, it is reasonable to assume that the drafters purposely employed language which would be appropriate whether or not the option was accepted.

LARSEN, Justice, dissenting.

On June 21, 1978, Judges David Craig and John A. MacPhail were appointed to the Commonwealth Court. On November 7, 1979, Judges Craig and MacPhail and also Judge Robert W. Williams, Jr., one of the respondents, were elected to full terms on the Commonwealth Court, all of their terms to begin on January 7, 1980.

---

**3.** Remarks of Delegate Woodside and Delegate Amsterdam, February 23, 1968, Journal of the Constitutional Convention of 1967–68, Volume II at page 1201.

**4.** The Constitution of 1968, art. 5, § 13(d) provides as follows:
"(d) At the primary election in 1969, the electors of the Commonwealth may elect to have the justices and judges of the Supreme, Superior, Commonwealth and all other statewide courts appointed by the Governor from a list of persons qualified for the offices submitted to him by the Judicial Qualifications Commission. If a majority vote of those voting on the question is in favor of this method of appointment, then whenever any vacancy occurs thereafter for any reason in such court, the Governor shall fill the vacancy by appointment in the manner prescribed in this subsection. Such appointment shall not require the consent of the Senate.

On June 28, 1979, Judge James R. Cavanaugh was appointed to the Superior Court. On November 7, 1979, Judge Cavanaugh, and also Judges John G. Brosky and Richard B. Wickersham, the other two respondents, were elected to full terms on the Superior Court, all of their terms to begin on January 7, 1980.

Petitioners, Judges Cavanaugh and Craig, brought this orginal action for a declaratory judgment by Petition for Review addressed to this Court's extraordinary jurisdiction, 42 Pa.C.S.A. § 726, asking for an adjudication of the proper manner of determining the priority of commission among the judges named above. Resolution of this issue involves the proper interpretation and application of Article V, § 10(e) of the Pennsylvania Constitution which provides:

> Should any two or more justices or judges of the same court *assume office at the same time,* they shall cast lots forthwith for priority of commission, and certify the results to the Governor who shall issue their commissions accordingly. (emphasis added)

Art. V, § 10(e), has also been embodied in the Judicial Code, 42 Pa.C.S.A. § 325(a).

The consequence of priority of commission among judges is for purposes of determining seniority. Petitioners argue that, by virtue of their prior appointments, they have been in continuous service on their respective courts longer than respondents have been, and therefore, they should be declared to have priority of commissions. Respondents argue, however, that Art. V, § 10(e) requires all of the judges elected on the same day, regardless of prior appointments, to cast lots to determine the priority of commission.

Essentially, petitioners make the unstartling assertion that the phrase "assume office at the same time" in section 10(e) refers to the time at which a judge assumes office. Respondents, on the other hand, take a less traditional linguistic approach—they argue, and the majority agrees, that "assume office at the same time" means "elected to office at the same time." Thus, the 1968 amendment to the Pennsylvania Constitution has been judicially repealed and

replaced by its predecessor, the related provision from the Constitution of 1874, Art. V, § 17. ("Should any two or more judges of the Supreme Court, or any two or more judges of the court of common pleas for the same district, *be elected at the same time,* they shall, as soon after the election as convenient, cast lots for priority of commission. . . .") I am surprised by this unusual interpretation which negates a constitutional amendment adopted by the vote of the people of this Commonwealth.

To begin, the matter is simply one of taking the language of Art. V, § 10(e) and applying it in a straightforward manner to the facts of the instant petition. The majority runs through this analysis, and concedes "petitioners' textual argument is well-made . . . ." 493 Pa. 560, 427 A.2d 156. Indeed the argument *is* well-made and, I submit, unassailable.

As petitioners have been longest in continuous service in their respective courts, they would have seniority over respondents unless Art. V, § 10(e) somehow alters that result. However, Art. V, § 10(e) merely provides unambiguously that judges who "assume office at the same time" shall cast lots to determine their priority of commission. We must therefore ask "what does 'assume office' mean"?

This phrase must be construed in its popular sense according to the common understanding of those adopting the amendment—the electorate of the Commonwealth. *Berardocco v. Colden,* 469 Pa. 452, 458–59, 366 A.2d 574, 577 (1976). As was stated long ago by this Court "what the [Constitutional] Convention adopted, and what the electors of the Commonwealth accepted, is the Constitution *as it is written,* and its clear meaning cannot be distorted to fit the views of those particular delegates. *It must be assumed that the people who voted upon the Constitution gave to the words employed their common and ordinary significance." Commonwealth ex rel. Margiotti v. Lawrence,* 326 Pa. 526, 532, 193 A. 46 (1937) (citation omitted).

There is no need to catalogue the various definitions of "assume" in this context, for they uniformly are given as to

take, to receive, to take upon oneself, to undertake, etc. *See, e. g.*, Webster's New Twentieth Century Dictionary (2nd ed. unabridged); Black's Law Dictionary (5th ed. West) ("To undertake; engage; promise."); 4A Words and Phrases, "Assume" (West 1969). While one "elected to" office has certainly "assumed office", the converse is not necessarily true and the common and ordinary usage of "assume office" recognizes there is more than one way to take on or engage in the duties of a public office. Indeed, one of the respondents in this case, Judge Brosky, admits that the word "assume" can encompass the taking of office by appointment. Brief for Respondent at 4.

The Pennsylvania Manual may be taken as a strong indicator of the meaning of "assume office" in the legal community. In the Manual, the common practice through the years has been to list the judges and justices as having "assumed office" on the date each began to perform judicial functions, whether they were appointed or elected. *See, e. g.*, 1978–79 Pennsylvania Manual at 548–49 listing, *inter alia* Justice John P. Flaherty (June 15, 1979), former Justice Thomas W. Pomeroy, Jr. (Dec. 30, 1968) and former Chief Justice John C. Bell, Jr. (July 31, 1961) as "assum[ing] office" on the dates of their respective appointments.

With the foregoing in mind, the following questions become cogent, and their answers clear and free from ambiguity.

1. When did Judge Craig "assume office"? Answer: June 21, 1978.*

2. When did Judge Cavanaugh "assume office"? Answer: June 28, 1979.*

3. When did respondents "assume office"? Answer: January 7, 1980.

---

* By stipulation of the parties, Judges Cavanaugh and Craig have performed their judicial functions for Superior and Commonwealth Courts, respectively, continuously from these dates.

4. Did Judges Craig and Cavanaugh, therefore, "assume office at the same time" as respondents? Answer: No.

Yet despite the explicit language of Art. V, § 10(e) and the simple and unambiguous application to the instant facts, the majority holds that the 1968 constitutional amendment means something other than what it says. In fact, they hold that it means what the 1874 Constitution says. What is the majority's justification for ignoring the constitutional mandate of 1968? The majority finds petitioners' well-made "textual" argument "unpersuasive in the context of the legislative [sic] history of the Constitution of 1968 and the clear public policy of this Commonwealth which favors an elected over an appointed judiciary."

Let us examine the "legislative" history and the "clear" public policy. Before we do, however, it must be stressed that *any* consideration of "legislative" history or policy is improper. It is *only* where a constitutional provision is ambiguous and/or its applicability to a set of circumstances uncertain that an appellate court may look to such factors. "Where the Constitution has expressed its purpose in clear and explicit language, a court cannot delimit the meaning of the words used by reference to a supposed intent which might be evoked from it, or from the debates before the constitutional convention...." *Commonwealth ex rel. v. Acker*, 308 Pa. 29, 34, 162 A. 159 (1932). The majority in this case looks to extraneous material to *first create* and *then* resolve an imagined "ambiguity". In dealing with construction of statutes, the legislature has admonished "[w]hen the words of the statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." Statutory Construction Act of 1972, 1 Pa.C.S.A. § 1921(b) (Supp. Pamphlet 1980–81). This Court has generally complied with this admonition. "We may resort to legislative history, however, only *when the words of a law are not explicit.*" *Hellertown Manufacturing Co. v. Commonwealth*, 480 Pa. 358, 365, 390 A.2d 732 (1978). These canons of construction are equally applicable where we are called upon to interpret the Constitution. *Booth & Flinn*

*Ltd. v. Miller*, 237 Pa. 297, 306, 85 A. 457 (1912). Accordingly, having found "petitioners' textual argument well-made", the task was at an end, and it was both unnecessary and improper to examine "legislative" history and public policy.

Turning to the majority's improper review of the "legislative" history and public policy, the inferences raised from both are precisely opposite those inferred by the majority. As the majority notes, there was a significant change in two respects from the language of the 1874 Constitution to that of the 1968 Constitution. The 1968 Constitution, Art. V, § 10(d), in no uncertain terms made the Chief Justice and president judges of courts with seven or less judges dependent upon the length of continuous service on the bench of the particular court. In keeping with this intention, the amendment altered "elected to office" to "assume office", in order to insure that length of service, and seniority, would remain the determinative factor regardless of whether service began by appointment or election. It defies logic and common sense to reason that this change was unintentional or was meant to maintain the pre-1968 status quo. "A change in the language of a statute ordinarily indicates a change in legislative intent." *Masland v. Bachman*, 473 Pa. 280, 374 A.2d 517 (1977) (citations omitted). *See also* The Statutory Construction Act of 1972, 1 Pa.C.S.A. § 1921(c)(5).

The majority nullifies this change based on two passing comments of delegates to the 1968 Constitutional Convention. Delegate Amsterdam stated:

> In accordance with an amendment put in by Judge Woodside, we provided in courts of 7 or less that the judges shall be the President Judges or Chief Justice as the case may be for longest and continuous service. Because of this situation, we have to provide as the old Constitution did, in the event there are two or more justices or judges who assume offices at the same time, they shall cast lots for priority of commission and that is all this does.

Delegate Woodside is quoted as explaining the amendment as "a provision which is in the substantial form that was in

the present constitution and was overlooked." These two remarks are, certainly, inconclusive *at best* with regard to the intent of these two delegates on the meaning of "assumed office" and it is incredible that the majority grasps at these straws to "interpret" Art. V, § 10(e) *in direct contravention* of the explicit language of that provision.

Moreover, it is highly improper to attach *any* significance to remarks of delegates to the Constitutional Convention. There is a critical difference between "legislative" history and the record of a constitutional convention. In the legislature, its members debate the design and purposes of proposed legislation. *These same members than enact or adopt the legislation.* At a constitutional convention, on the other hand, the delegates merely suggest or recommend the constitutional provisions. *The electorate then adopts (or rejects) the provision.* It is extremely doubtful that any of the electorate who adopted Art. V, § 10(e) in 1968 even knew of the two chance remarks of the delegates, let alone attached to the remarks the inference gleaned by the majority. As Justice Paxson stated in 1886, in *Commonwealth v. Balph*, 111 Pa. 365, 380, 3 A. 220:

> In the consideration and discussion of this section of the Constitution I throw out of view the copious citations which have been furnished us from the debates in the convention. They are of value as showing the views of individual members, and as indicating the reasons for their votes. But they give us *no light as to the views of the large majority who did not talk; much less of the mass of our fellow citizens whose votes at the polls gave that instrument the force of fundamental law.* We think it safe to construe the Constitution from what appears upon its face." Quoted in *Commonwealth ex rel. Margiotti v. Lawrence, supra* at 326 Pa. 532, 193 A. 46.

It seems then, that the majority has implicitly overruled *Commonwealth v. Balph, Commonwealth ex rel. Margiotti v. Lawrence,* and the line of cases which has consistently heeded the instructions of those cases, and has developed a novel approach to constitutional interpretation by exhalting

even chance and unclear remarks of constitutional convention delegates to such a lofty status that such remarks are permitted to cancel the expressed will of the electorate.

If we are going to consider the remarks of the delegates, however, then we must consider the excellent amicus brief submitted by the very delegate whose "substantial form" remark has swayed the majority, namely Delegate, and former Judge, Robert E. Woodside, co-chairman of the 1968 Constitutional Convention subcommittee on Judicial Organization. I quote at length from Judge Woodside's brief:

> I file this amicus curiae brief solely in support of a principle with which I dealt in a great variety of capacities for a number of years, and because I, and I am sure other delegates to the Constitutional Convention concerned with the relevant language, *thought the issue was settled beyond any doubt by the deletion of the election language used in the Constitution of 1874, and the use of different language with a different meaning in the Constitution of 1968.*

*　　*　　*　　*　　*　　*

> In spite of the deletion of the "election" provision and the clarity of the substituted language contained in the present Constitution, it is contended that the Convention intended no change in the "election" provision of the 1874 Constitution. *This contention, so contrary to the clear and unambiguous language used in the Constitution,* is based upon a brief reference by me to the Convention concerning an amendment made to Article V, § 10 adding after paragraph "d" a new paragraph "e". I am correctly quoted as saying that it was "a provision in substantial form that is in the present Constitution and was overlooked. It should be provided in this Constitution." Paragraph "d" had provided beyond any shadow of a doubt that the *judge longest in continuous service* should be president judge. The election provision was deleted. *It is axiomatic that one serving on the court by appointment at the time of election was longer in continuous service than one subsequently taking office by election.*

III.  *Remarks and Amendment Misconstrued*

It has been argued to you that the convention was led to believe that the changes of language from "elected at the same time" to "assume office at the same time" in § 10 made no change in the provision of the Constitution relative to priority of commission and the determination of the Chief Justice and president judges.  *Nothing could be further from the truth.*  What happened, as the record will clearly show, was this:  paragraph "d" set forth as clearly and accurately as anyone could write it that the *Justice or judge longest in continuous service was always—not sometimes—entitled to the office of Chief Justice or president judgeship.*  That language settled that an appointed judge who served longer continuously on the court than one later elected with him had priority over the judge assuming office subsequently by election.

What had been "overlooked," using my language, on the convention floor?  There was no provision in the proposed Article V to cover the situation where two or more judges *assumed office at the same time.*  There was no provision for casting lots under any circumstances.  There was no provision to determine priority of commission and the right to the Chief Judgeship or president judgeship where two judges would have been appointed *or* elected at the same time.  *That is why paragraph "e" was added, and for that reason alone.*  (emphasis added).

Brief for Amicus Curiae, Robert E. Woodside at 3, 9–11. I am at a loss to understand why the majority has chosen to ignore this succinct and persuasive explanation of Delegate Woodside's remarks *from the Delegate himself.*

Clearly then, if it were legitimate to resort to "legislative" history, the inference would be 180° away from the reading given the sparse convention record relied upon by the majority.

The other magic talisman employed by the majority to make the language of the 1968 amendment disappear is "policy"; the "strong public policy" in favor of elected judges over appointed judges is also a make-weight pseudo-

rationale under the circumstances of this case. It must be remembered that the correct constitutional interpretation and application in this case *in no way favors an appointed judge over an elected judge—all of the judges involved have been duly elected.* They all stand on equal footing in their elected roles, but petitioners have served an additional period—the period of their service as appointees. The proper constitutional construction merely implements the public policy expressed in Art. V, § 10(d) which places a premium on *experience.*

The framers of the 1968 amendment intended specifically to recognize experience, i. e., length of continuous service, as the *only* criteria for determining who shall be the president judge or chief justice of courts with seven or less judges. *See* Brief for Amicus Curiae, Robert E. Woodside, at 7–9. Experience comes from the length of time one serves a particular function. That experience is not diminished merely because part of that time was "appointed time" and not "elected time," and it is misleading to suggest otherwise. One can conceive of potential drawbacks to such a system wherein the sole consideration is length of service, and policies based on other important factors might favor another system. However, the existence of other legitimate policies is *of no moment in this case.* The constitutional mandate has established the policy and we are obliged to implement it, whether or not it is the best system. Accordingly, as Judges Craig and Cavanaugh have served their respective courts longer than have respondents, the Constitution dictates that petitioners have priority of commission over respondents.[1]

Finally, inasmuch as Rule 705(a) and (b) of the Pennsylvania Rules of Judicial Administration (*see* note 1 of the majority opinion) is in direct and irreconcilable conflict with

---

1. *All* of the jurists involved in this case are highly competent and conscientious judges. This opinion should in no way be taken as support for, or opposition to, any particular judge, but rather, in support of the principle expressed in the explicit language of the Constitution.

Art. V, § 10 of the Pennsylvania Constitution, as well as with The Judicial Code, 42 Pa.C.S.A. § 325(a), it must be abrogated. This Court has *no authority* to adopt a rule of court or of administration which is unconstitutional. Art. V, § 10(c) of the Constitution provides this Court shall have the power to prescribe general rules of practice, procedure and administration *if such rules are consistent with the Constitution.* I understand the reluctance of those members of the majority who were on the bench when Rule 705 was adopted (in 1972) to reverse their position. However, this reluctance must be overcome and the conflict between Rule 705 and Art. V, § 10(e) resolved in favor of the Constitution. It must be remembered that this Court's informal rule promulgating process is not of an adversarial nature. A Rules Committee will make recommendations to this Court and we will act on those recommendations and proposals. Should a particular rule be inconsistent with the constitution, there is no advocate to argue its unconstitutionality. Thus, occasionally, an error is possible and when this Court becomes aware of such error, we should not hesitate to rectify it and conform our rules to the Constitution.